**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

**UNITED STATES OF AMERICA,**

        **Plaintiff**

**-vs-**                                                                        **Case No. 2:06-cr-74-FtM-29DNF**

**JOSE ANTONIO JIMENEZ and**
**PEDRO ENRIQUE JIMENEZ,**

        **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    This cause came on for consideration on the following motion filed herein:

> **MOTION:**    **MOTION TO SUPPRESS (Doc. No. 30)**
>
> **FILED:**    **August 4, 2006**
>
> _____
>
> **THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

    The Defendants Jose Jiminez and Pedro Jimenez are requesting that the Court suppress all evidence directly obtained from or as a result of their arrests. They argue that their arrests were illegal. The Defendants filed a Post-Evidentiary Hearing Memorandum of Law (Doc. 46). The Government filed a Response (Doc. 32) and a Supplemental Response (Doc. 42) and argues that the officers had probable cause to arrest or detain the Defendants. The Defendants are charged in a one count Indictment with possessing with intent to distribute a detectable amount of marijuana, namely 100 or more marijuana plants in violation of 21 U.S.C. 841(a)(1) and 841(b)(1)(B)(vii), and 18 U.S.C. §2. (See, Doc. 14).

**I. Testimony and Evidence**

The Government presented the testimony of Detective Steven Harris, and Detective Michael Pepitone from the Glade County Sheriff's Office. (Tr.[1] p. 5, 68).  The Defendants presented the testimony of Enrique Jiminez.

**A.  Testimony of Detective Harris**

Detective Harris testified that he has been with the Glades County Sheriff's Office for 7 years. (Tr. p. 5).   He is certified in the identification of narcotics and was assigned to the DEA task force. (Tr. p. 5).  He went to marijuana eradication school. (Tr. p. 6).  On June 8, 2006, Detective Harris was notified by Sheriff Whiddon of the Glades County Sheriff's Office, that the Sheriff had received information from a concerned citizen that there were strange activities occurring at the residence at 3960 Indian Hills Drive ("residence"). (Tr. p. 6, 7, 32).   Detective Harris, Sheriff Widden, Captain Lewis and Detective Pepitone went in an unmarked vehicle to this residence for surveillance at approximately 9:30 a.m. (Tr. p. 7-8).  The area around the residence was semi-rural with sporadic houses on a few lots, and there were no houses on adjoining lots to the Indian Hills residence.  (Tr. p. 8).   The officers drove around the residence and used binoculars to view the residence. (Tr. p. 9). Detective Harris saw three air conditioner units outside of the residence. (Tr. p. 9).   In addition, all of the windows were covered with blinds, and using binoculars, he saw paneling on the inside of the windows where the vanes on the blinds were broken. (Tr. p. 9-10).  His suspicions were raised due to the excessive air conditioning units and the odd window coverings. (Tr. p. 10).  There was a five-

---

[1] "Tr." refers to the transcript of the hearing (Doc. 45).

foot chainlink fence around the lot that was double padlocked, and there was PVC piping in the yard. (Tr. p. 10-11). Harris also observed a hose from a well that went into the house. (Tr. p. 11).

While Detective Harris watched the residence, a Jeep backed into the driveway of the residence, but did not enter the fenced-in area. (Tr. p. 11, 12). All of the doors of the Jeep opened, and Detective Harris saw people on cell phones inside the vehicle. (Tr. p. 11). He identified two of the people in the vehicle as the two Defendants in the courtroom at the hearing. (Tr. p. 12). One person exited the vehicle. (Tr. p. 12). Detective Harris felt that his surveillance was compromised so he decided to have Detective Pepitone drive him to the front of the residence, and he made a consensual contact with the person who exited the vehicle, Jose Jiminez. (Tr. p. 12-13). He asked if Jose Jiminez knew the owner of the adjoining property, and Jose Jiminez indicated he did not. (Tr. p. 13). Detective Harris detected a strong odor of raw marijuana coming from Jose Jiminez. (Tr. p. 13-14). Detective Harris returned to the vehicle, advised the other officers of what he smelled, and left the area to conceal himself again in a different location for further surveillance. (Tr. p. 14, 44). He saw the Jeep leave the residence. (Tr. p. 15).

Detective Harris was driven to a fire station which was near the residence. (Tr. p. 15). He and Sheriff Widden left the vehicle, concealed themselves in the palmetto woods across the street from the residence, and continued to watch the residence. (Tr. p. 15, 16). He saw the Jeep return to the driveway of the residence. (Tr. p. 17). Jose Jiminez and Pedro Jiminez exited the Jeep, and one male stayed in the Jeep. (Tr. p. 17). Jose Jiminez and Pedro Jiminez unlocked the fence and went into the residence. (Tr. p. 17). They were in the residence for three to five minutes. (Tr. p. 17). Jose Jiminez and Pedro Jiminez returned to the Jeep, and they were driven away. (Tr. p. 18). They left the residence rapidly. (Tr. p. 18). Detective Harris notified Detective Pepitone that the subjects had exited

the house and driven away. (Tr. p. 19). Detective Harris walked to one side of the residence and smelled the odor of raw marijuana coming from the residence. (Tr. p. 20). He was 50 to 60 feet from the residence when he smelled the raw marijuana odor. (Tr. p. 23). He suspected that the house contained a marijuana grow operation based upon the odors, and other suspicious factors. (Tr. p. 21). Detective Pepitone contacted Detective Harris and told him that the Jeep had been stopped for a traffic violation. (Tr. p. 48). Detective Harris advised his fellow officers by cell phone that the house was a marijuana grow house because of the odor he smelled. (Tr. p. 49). He asked the officers to ask the three suspects to return to the residence. (Tr. p. 49).

Jose Jiminez, Pedro Jiminez, and Enrique Jiminez returned to the residence in their own Jeep following Detective Pepitone. (Tr. p. 22). Detective Harris spoke with Pedro Jiminez in English and read him his *Miranda* rights in English. (Tr. p. 23-24). Pedro Jiminez stated he understood his rights, waived his rights, and agreed to speak with him. (Tr. p. 24, 57-58). Detective Harris asked Pedro Jiminez why he smelled of raw marijuana, and he responded because he had 80 marijuana plants in the residence. (Tr. p. 24-25). Pedro Jiminez signed a consent to search the residence. (Tr. p. 25-26). The officers did not search the residence pursuant to the consent, but did search the residence pursuant to a search warrant that was obtained later. (Tr. p. 25-26). Detective Harris spoke with Jose Jiminez. (Tr. p. 26). Detective Harris read him his *Miranda* rights, and Jose Jiminez agreed to speak to him. (Tr. p. 26). Jose Jiminez said that he was there to feed a dog. (Tr. p. 26).

### B. Testimony of Detective Pepitone

Detective Pepitone testified that he had been with the Glades County Sheriff's Office for 11 years. (Tr. p. 68). On June 8, 2006, Sheriff Whiddon advised Detective Pepitone that he received

some information concerning a residence in the Indian Hills subdivision, and that there were odd activities at the residence. (Tr. p. 69, 82). The Sheriff thought the residence was a possible grow house. (Tr. p. 83). Detective Pepitone drove with Sheriff Whiddon, Captain Lewis and Detective Harris to the residence. (Tr. p. 70). He saw that the windows of the residence were covered with blinds and boarded from the inside, there were three air conditioning units outside of the residence, there were bags of fertilizer in the yard, and there was PVC piping extending out of the wall of the house and back into another wall of the house. (Tr. p. 71). Detective Pepitone testified that these observations were normal attributes of a marijuana grow house. (Tr. p. 71). He observed a Jeep pull into the driveway of the residence. (Tr. p. 71). Detective Harris exited the vehicle and made contact with one occupant of the Jeep. (Tr. p. 71-72).

After this encounter, Detective Pepitone drove the Sheriff, Captain Lewis and Detective Harris to a fire station. (Tr. p. 72). The Sheriff and Detective Harris exited the vehicle and walked away to conceal themselves and continue their surveillance of the residence. (Tr. p. 72-73). Detective Pepitone saw the Jeep leave the residence at a high rate of speed, possibly 80 to 90 mph. (Tr. p. 73, 74). He followed the Jeep. (Tr. p. 74). He tried to clock the Jeep for speeding, but failed to pace it. (Tr. p. 75). He observed the Jeep failing to completely stop at a stop sign. (Tr. p. 75). He determined that he had probable cause to stop the Jeep for a traffic violation and he pulled the Jeep over. (Tr. p. 75). The Jeep was approximately 2 to 3 miles from the residence.

The driver of the Jeep, Enrique Jiminez, produced a driver's license, and registration. (Tr. p. 76). Enrique Jiminez gave his consent to search the vehicle. (Tr. p. 76). Enrique Jiminez also stated that he had a firearm in his pocket, which Officer Pepitone confiscated. (Tr. p. 76). Captain Lewis ran a driver's licence and registration check while Detective Pepitone conducted the search of the vehicle.

(Tr. p. 77). Detective Pepitone also obtained identification documents from Jose Jiminez and Pedro Jiminez. (Tr. p. 80).

Captain Lewis told Detective Pepitone that Detective Harris had detected the odor of marijuana coming from the residence. (Tr. p. 127). After the search of the vehicle, Officer Pepitone asked Enrique Jiminez if all of them would return to the residence. (Tr. p. 78). They talked among themselves in Spanish, went into the Jeep, and drove back to the residence. (Tr. p. 78). Detective Pepitone led the way to the residence, followed by the Jeep, and another law enforcement vehicle. (Tr. p. 79). Detective Pepitone kept custody of the driver's licence and registration of Enrique Jiminez, and identification documents and cell phones of the occupants of the Jeep. (Tr. p. 80).

### C. Testimony of Enriquez Jiminez

Enrique Jiminez testified that he was the driver of the Jeep on June 8, 2006. (Tr. p. 104). He was stopped by a vehicle with lights, and a man in civilian clothes with a badge asked for his driver's license and registration. (Tr. p. 104-5). He got out of the car. (Tr. p. 105). He was asked if he was armed, he responded he was, and the officer took his weapon and his licence for the weapon which was expired. (Tr. p. 105). Enrique Jiminez was told that he went through a stop sign, but he denied it. (Tr. p. 105). He gave his consent to search the vehicle, and the officer ordered his brothers to get out of the car. (Tr. p. 105). The officer took the cell phones in the car. (Tr. p. 105). Enrique Jiminez was told to get back into the Jeep, and follow the officer back to the residence. (Tr. p. 105-106). He was also told not to try to flee. (Tr. p. 106). He was not given back his driver's licence or registration. (Tr. p. 106). He had no option but to follow the officers to the residence. (Tr. p. 107).

**II. Analysis**

The Defendants assert that the officers did not have probable cause to arrest the Defendants at the traffic stop. The Fourth Amendment provides protections to individuals from unreasonable searches and seizures by government officials, and this protection extends to investigatory stops of people or vehicles. *United States v. Johnson*, 2006 WL 2337741, *2 (11th Cir. 2006), (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

**A. The Stop**

A stop of an automobile by police, even if only for a brief period of time and for a limited purpose constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810 (1996), citations omitted. A traffic stop must not be "unreasonable" under the circumstances. *Id.* at 810. A decision to stop a vehicle is reasonable when the officer has probable cause to believe a traffic violation occurred. *Id.*

In this case, Detective Pepitone witnessed the Jeep driven by Enrique Jiminez fail to completely stop at a stop sign, and pulled the Jeep over for this traffic violation. Both Detective Pepitone and Detective Harris testified that the Jeep was traveling at a high rate of speed when it left the residence. Although Enrique Jiminez testified that he did fully stop at the stop sign, he also testified that he was not traveling at a high rate of speed. The Court determines that the testimony of Detective Pepitone is credible, and his observation that Enrique Jiminez did not completely stop at a stop sign was a valid reason to stop Enrique Jiminez for a traffic violation.[2]

---

[2] In their Post-Evidentiary Hearing Memorandum of Law, the Defendants concede that the traffic stop was lawful for the purposes of the Motion to Suppress. (See, Doc. 46, p. 3).

Even if the Court finds Enrique Jiminez's rendition of the facts to be credible, the officers would be permitted to stop the vehicle if they had reasonable suspicion that criminal activity "'may be afoot.'" *United States v. Johnson*, 2006 WL 2337741, *2 (11th Cir. 2006), (quoting *United States v. Arvizu*, 534 U.S. 266, 273 2002)). ""Reasonable suspicion is determined from the totality of the circumstances, and from the collective knowledge of the officers involved in the stop.'" *United States v. Davis*, 175 Fed.Appx. 286, 287 (11th Cir. 2006), (quoting *United States v. Williams,* 876 F.2d 1521, 1523 (11th Cir. 1989)). "The officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Davis,* 175 Fed.Appx. at 287, (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The Court may look to objective observations, information from police reports, and an individual's proximity to illegal activity to determine if reasonable cause existed to stop the vehicle. *United States v. Davis*, 175 Fed.Appx. at 288, *United States v. Johnson,* 2006 WL 2337741 at *2.

"'Officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation.'" *Id*. (*quoting Illinois v. Wardlow*, 528 U.S. 119, 120 (2000)). However, a person's proximity to an area of suspected illegal activity alone is not enough to support a reasonable suspicion that the person is committing a crime. *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006). Officers must base their determination of reasonable suspicion on inferences about human behavior. *United States v. Nunez*, 455 F.3d at 1226 (*quoting Illinois v. Wardlow,* 528 U.S. at 120).

At the time of the stop, the officers had collective knowledge of the following facts. A concerned citizen notified Sheriff Widden that unusual activity was occurring at the residence. Detective Harris found that Jose Jiminez smelled of raw marijuana outside of the residence. The

residence had three air conditioning units, window coverings that totally concealed all light, PVC piping in the yard of the residence and coming out of the residence, a hose from a well going into the house, a padlocked chainlink fence surrounding the property, and bags of fertilizer in the yard. Two of the occupants of the Jeep, the Defendants, went into the residence using a key to unlock the padlock on the fence, and entered the door of the residence. Based on the experience and observations of Detective Harris and Detective Pepitone, they had reasonable suspicion that criminal activity was occurring at the residence and that the individuals in the Jeep were involved in the criminal activity.

The Court determines that the officers also had reasonable suspicion that criminal activity was occurring, and therefore, the stop of the Jeep was also permissible on that basis.

### B. The Seizure

Detective Pepitone took the driver's licence and registration from Enrique Jiminez, and identification documents and cell phones from Jose Jiminez and Pedro Jiminez. The Defendants were clearly not free to leave after their documents and phones were taken and not returned. *See, United States v. Perez*, 443 F.3d 772, 777-778 (11th Cir. 2006) (Retaining identification is a factor to consider in determining if a person is free to leave). Whether Jose Jiminez and Pedro Jiminez were detained or arrested is determined by reviewing the totality of the circumstances and the degree of intrusion. *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995). Detective Pepitone either asked or directed Enrique Jiminez to drive Jose Jiminez and Pedro Jiminez back to the residence. In either scenario, Enrique Jiminez did not have any choice but to return to the residence due to Detective Pepitone retaining all the personal documents of the Defendants and Enrique Jiminez. *See*, *Florida v. Royer*, 460 U.S. 491, 501-502 (1983) (Retaining an airline ticket and driver's license while being asked

by law enforcement officers to accompany them to a police room, without telling the defendant he was free to leave is a seizure within the meaning of the Fourth Amendment). The Court determines that pursuant to the Fourth Amendment, the Defendants were seized and were not free to leave at the time they were told to return to the residence.

For an arrest to be valid without a warrant, an officer must have probable cause to arrest. *United States v. Watson*, 423 U.S. 411, 417 (1976), *Holmes v. Kucynda*, 321 F.3d 1069, 1079 (11th Cir. 2003). To determine if probable cause exists, the officer must have "at the moment the arrest was made, the 'facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing' that [the suspect] had committed or was committing an offense." *Holmes*, 321 F.3d at 1079, citing, *Dahl v. Holley*, 312 F.3d 1228, 1233 (11th Cir. 2002), (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). To make an arrest, the officers must have probable cause to affect the arrest and not just probable cause to search a residence. *See*, *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

The Defendants assert that the Eleventh Circuit Court of Appeals in *United States v. Nunez*, 445 F.3d 1223 (11th Cir. 2006) only found reasonable suspicion rather than probable cause on facts that were similar to the case at bar. In *Nunez*, the officers witnessed the defendants at the grow house, saw the defendants spend some time inside the residence, and observed one defendant carry a trash bag out of the residence. *Id*. at 1226. After the defendants drove away from the residence with the trash bag, the officers stopped the vehicle. *Id*. The Court found that the officers had reasonable suspicion that the defendants were involved in activities related to contraband from the residence. *Id*. The Court of Appeals held that the stop of the vehicle was not unreasonable. *Id*. The issue of probable cause to

arrest was not addressed by the Court of Appeals, and therefore, the *Nunez* case is distinguishable from the case at bar.

The Defendants also cite *Florida v. Royer*, 460 U.S. 491 (1983) for the proposition that probable cause did not exist in the case at bar. In the *Royer* case, the officers discovered that the defendant was traveling under an assumed name, was nervous, and had paid cash for a one-way airline ticket. *Id*. at 502, 507. The officers told the defendant that they were narcotics agents and suspected him of carrying narcotics. *Id*. The officers retained the defendant's identification and airline ticket, and asked him to accompany them to an interrogation room. *Id*. The Supreme Court held that probable cause to arrest the defendant did not exist until after the officers searched his luggage, and that he was illegally detained. *Id.* at 507. The Defendants argue that the officers in the instant case did not have probable cause at the time of their arrest.

The collective knowledge of the Deputies and the Sheriff was the same at the time of arrest as at the time of the stop. The only additional information obtained during the stop was from Detective Harris who remained at the residence and reported to Captain Lewis that he smelled the odor of raw marijuana emanating from the residence. The odor of marijuana coupled with other facts can establish that probable cause exists to believe that individuals are involved in criminal activity. *United States v. Gooden*, 148 Fed. Appx. 846, 848 (11th Cir. 2005), *see also, United States v. Rodriguez*, 171 Fed. Appx. 698, 699 (9th Cir. 2006) (Agents had probable cause to arrest when smelled marijuana and observed other suspicious activities). When Detective Harris called Captain Lewis and told him about the odor emanating from the residence, he then asked that the Jiminez's be brought back to the residence.

The officers had the following information at the time of the arrest: Detective Harris smelled the odor of raw marijuana at the residence; Detective Harris smelled the odor of raw marijuana on Jose Jiminez; Jose Jiminez and Pedro Jiminez had access to the locked fence and to the residence; the residence had multiple air conditioning units; PVC piping was at the residence; fertilizer was in the yard; and a hose was going from the well into the residence. From the combination of these factors, the Court determines that the Deputies had probable cause to believe that criminal activity was being committed, and that Jose Jiminez and Pedro Jiminez were involved in the criminal activity. Therefore, the Court determines that the arrests of Jose Jiminez and Pedro Jiminez were lawful. It is respectfully recommended that the Motion to Suppress (Doc. 30) be denied.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this __12th__ day of September, 2006.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies:
All Parties of Record